**Peggy DEGHAND, Plaintiff,**

v.

**WAL–MART STORES, INC., Defendant.**

**No. 94–4172–SAC.**

United States District Court,
D. Kansas.

April 11, 1996.

**1008**

Amy C. Bixler, Alan G. Warner, Topeka, KS, for plaintiff.

Mark D. Katz, Sherman, Taff & Bangert, P.C., Leawood, KS, Steven D. Steinhilber, Sherman, Taff & Bangert, P.C., Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant's motion for summary judgment (Dk. 43), the defendant's motion to strike (Dk. 49) the affidavits of the plaintiff and her husband, the defendant's motion for summary judgment on the defamation claim (Dk. 69), and the defendant's motion to strike or disallow the plaintiff's proposed additions to the pretrial order (Dk. 71). This is an employment discrimination case in which the plaintiff alleges seven claims: three of which are alleged as violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.* and the other four are alleged as state common-law actions. The defendant seeks summary judgment on all seven claims, and the plaintiff opposes the same.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of

material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; it requires "'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.'" *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir.1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas Drilling Partnership v. Federal Deposit Ins. Corp.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

For purposes of this motion, the court considers the following facts to be uncontroverted.

The defendant Wal–Mart Stores, Inc. hired the plaintiff, Peggy Deghand, in October of 1991 to work as a cashier supervisor at Sam's Club in Topeka, Kansas ("Sam's Club"). At the time of hiring, Peggy received and signed for an employee handbook and other written information concerning her employment.

Later in 1991, Sam's Club also hired the plaintiff's husband, Anthony Deghand. He worked as a team leader [1] in the grocery department. In October of 1992, Anthony suffered a hernia that required surgical care and six weeks of medical leave from work. Anthony filed a workers' compensation claim for the hernia.

When he returned to work in December of 1992, Anthony Deghand avers that he asked for a transfer to the membership department, because this would be less physically demanding than his current position in the grocery department and because it was considered a management track position. Anthony did not receive his requested transfer; instead, he was transferred to team leader of the receiving department. According to Anthony, this new position was more physically demanding than the membership department work. John Festa, assistant manager, supervised Anthony in the receiving department after June 4, 1993.

In late June of 1993, Anthony Deghand spoke privately with John Festa and became quite emotional. Anthony worked July 2, 1993, and then took two weeks of leave. He returned on July 19, 1993, worked six hours and then was sent home. He has never returned to work at Sam's Club. Anthony says he suffered a mental breakdown in the summer of 1993 that caused him to take medical leave from Sam's Club. In July of 1993, Anthony was diagnosed as suffering from depression. The parties have stipulated that the defendant knew that from and after July 18, 1993, Anthony was a disabled person within the meaning of the ADA.

In July of 1993, Anthony Deghand filed a worker's compensation claim asserting that the depression was a compensable injury. Wal–Mart opposed Anthony's worker's compensation claim. The administrative law

---

1. At all times relevant here, the chain of authority at Sam's Club started at the top with the store's general manager, followed by the assistant managers, and continued with hourly associates that encompassed team leaders and supervisors, and ended with the hourly employees.

judge in the worker's compensation proceedings denied Anthony's application for preliminary benefits in an order dated June 9, 1994.

On September 28, 1993, Lori Falkenstein, an employee at Sam's Club assigned to the jewelry counter, telephoned an assistant manager of the Sam's Club store, Dawn Miller, at home and described some incidents involving Peggy Deghand. The next day, September 29, 1993, Lori Falkenstein was asked by Dawn Miller and the general manager of the Sam's Club store, Don Bradley, to put in writing what she had told Miller the previous evening. Falkenstein wrote the letter while sitting in the management office. Falkenstein's letter complained in part that Peggy Deghand had revealed to Falkenstein confidential payroll information and other confidential information. By affidavit, the plaintiff denies the allegation that she revealed to Falkenstein the salary increases of any Sam's Club employee.

Don Bradley testified that before receiving Falkenstein's letter he had heard that his unit managers suspected the plaintiff of some activities. Bradley said that Falkenstein's letter "basically put it [the suspicion] into perspective." (Bradley Dep. at 66). Dawn Miller also testified that others had come to her with complaints about the plaintiff. Miller also testified that she believed what was found in Falkenstein's letter because it was consistent with what others had said and with what she had observed.

On October 6, 1993, Don Bradley evaluated Peggy's work and gave her at least a satisfactory rating in all categories evaluated for the period. He further recommended that she receive a pay increase.

On October 7, 1993, Harley Lowe, acting at the direction of Don Bradley, removed the plaintiff from her supervisory position over the cashiers. Bradley testified he took this employment action because Peggy Deghand had divulged confidential information. The plaintiff avers that on October 7, 1993, Lowe first told her that "it's a dirty job but somebody's got to do it," and then he explained that he had been given orders to remove her from the cashier supervisory position. She further avers that Lowe said the removal was due to circumstances and that Lowe then talked about the plaintiff's husband and her stressful home life. She also avers that Lowe gave her no other explanations for the removal.

According to Bradley, when Lowe removed the plaintiff, he also offered her a position in marketing at the same rate of pay and with similar hours but without access to confidential information. The plaintiff stated that Lowe referred to two possible part-time positions but never mentioned that her pay and hours would remain the same. The plaintiff also avers that based on her experience and knowledge the positions offered were seasonal, required persons to work hours different from her previous schedule, and were compensated at a lower rate than what she had been receiving.

Beginning October 7, 1993, Peggy Deghand took a vacation that was scheduled to end on October 18, 1993. During her vacation, a physician diagnosed the plaintiff as suffering from hypertension or high blood pressure. The defendant did not know that the plaintiff had high blood pressure when it removed her from the supervisory position. Her physician placed the plaintiff on medical leave because of the hypertension. The plaintiff took the medical leave slips to the Sam's Club and told Don Bradley that she was being treated for hypertension.

According to the plaintiff's affidavit, on November 10, 1993, Peggy Deghand told Lowe that her physician would be releasing her from medical leave on November 15, 1993, and that she would be ready to resume work then. Lowe did not give her a work schedule at that time. The plaintiff called Dawn Miller on November 15, 1993, and asked for her work schedule. Dawn Miller said she didn't know that Peggy was coming back and that she would talk with Don Bradley and then contact her. After waiting for four days without call from anyone at Sam's Club, the plaintiff filed for unemployment compensation on November 19, 1993, and subsequently received it over the defendant's opposition. The plaintiff wrote Don Bradley a letter dated December 6, 1993, in which she declined an apparent offer of employment and explained that she considered herself

"constructively discharged" by reason of her demotion and the differences between her former supervisory position and the offered position.

In January of 1994, Peggy Deghand's claim for unemployment compensation proceeded to hearing before the Kansas Department of Human Resources Office of Appeals. Don Bradley and the plaintiff were present at the hearing. Bradley told the hearing officer that an employee, in writing, had complained that Peggy Deghand had divulged confidential information, taken extended breaks, and had been unable or unwilling to perform certain job duties. At the hearing, the plaintiff denied these allegations.

■■■ Summary judgments are "used sparingly in employment discrimination cases." *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir.1995). This is because discrimination claims often turn on the employer's intent, *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992), and courts ordinarily consider summary judgment inappropriate to settle an issue like intent, *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir.1994). Even so, summary judgment is not "per se improper," *Washington v. Lake County, Ill.*, 969 F.2d 250, 253 (7th Cir.1992), and may be useful in weeding out claims and cases obviously lacking merit, *Summers v. State Farm Mut. Auto. Ins. Co.*, 864 F.2d 700, 709 (10th Cir.1988), *overruled on other grounds*, *McKennon v. Nashville Banner Pub. Co.*, — U.S. —, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). Thus, if the plaintiff's evidence fails to create any reasonable doubts about the employer's expressed lawful motive for taking the adverse employment action, summary judgment is proper. *Cone*, 14 F.3d at 530.

## ADA CLAIM: DISCHARGE BECAUSE OF THE PLAINTIFF'S DISABILITY

The plaintiff's first ADA claim is that the defendant constructively discharged her in late November of 1993 due to her disability of hypertension. The defendant seeks summary judgment arguing first, that the plaintiff did not suffer a "disability" as that term is defined under the ADA, and second, that

the defendant did not know of the plaintiff's hypertension during the relevant time period.

■■■ The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To state a prima facie case of disability discrimination on an employment termination claim, the plaintiff must demonstrate: "(1) that [s]he is a disabled person within the meaning of the ADA; (2) that [s]he is qualified, that is, with or without reasonable accommodation (which [s]he must describe), [s]he is able to perform the essential functions of the job; and (3) that the employer terminated [her] . . . because of [her] . . . disability." *White v. York Intern. Corp.*, 45 F.3d at 360–61 (citations omitted).

■■■ "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). To decide whether someone is disabled as defined above, one must know the meaning of three other important terms, "physical or mental impairment," "substantially limits," and "major life activities." Because the ADA does not define any of these terms, we are guided by the definitions adopted by the Equal Employment Opportunity Commission ("EEOC") in regulations issued pursuant to 42 U.S.C. § 12116. *See Bolton v. Scrivner Inc.*, 36 F.3d 939, 942 (10th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995).

The ADA regulations adopt the definition of *"physical or mental impairment"* found in the Rehabilitation Act regulations, 34 C.F.R. Pt. 104. *See* 29 C.F.R. Pt. 1630, Appendix to Part 1630—Interpretative Guidance on Title I of the Americans with Disabilities Act, § 1630.2(h) Physical or Mental Impairment; *Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir.1995) ("[T]he ADA borrows extensively from the Rehabilitation Act and

**1012**

uses many of the same terms."). The term means "any physiological disorder or condition, ... affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory ..., cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or ... [a]ny mental or psychological disorder, ... and specific learning disabilities." 29 C.F.R. § 1630.2(h) (1995).

"Many impairments do not impact an individual's life to the degree that they constitute disabling impairments." 29 C.F.R. Pt. 1630, App., § 1630.2(j); *Hamm,* 51 F.3d at 726. An impairment or a combination of impairments are considered disabling if they substantially limit one or more of a person's major life activities. *Id.* The ADA regulations define *"substantially limits"* as follows:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). In short, the disability determination does not depend as much on the name or diagnosis of the impairment as it does on the effect the impairment has on a particular individual. 29 C.F.R. Pt. 1630 App. § 1630.2(j); *see Chandler v. City of Dallas,* 2 F.3d 1385, 1396 (5th Cir.1993) ("[T]he effect of a given type of impairment, both on major life activities in general and on a person's ability to perform specific tasks, can vary widely from individual to individual."), *cert. denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994).

The EEOC has adopted the definition of *"major life activities"* found in the Rehabilitation Act. *Bolton,* 36 F.3d at 942. This term "means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Working" in this definition "does not necessarily mean working at the job of one's

choice." *Welsh v. City of Tulsa, Okl.,* 977 F.2d 1415, 1417 (10th Cir.1992).

The plaintiff here argues the medical leave slips from her doctor are enough to show that her hypertension substantially limited her ability to work. With respect to the major life activity of working, the ADA regulations provide that:

The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i); *see also Bolton,* 36 F.3d at 942. To defeat the summary judgment motion, the plaintiff must present evidence from which it could be reasonably found that her impairment restricts her ability to perform either a class of jobs or a broad range of jobs in various classes.

The ADA regulations specify three factors relevant in considering whether the impairment is one that substantially limits a major life activity: "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2); *see Bolton,* 36 F.3d at 943; *cf. Joyce v. Suffolk County,* 911 F.Supp. 92, 96 (E.D.N.Y.1996) (The need for eyeglasses and blood pressure medication are "minor" and "widely shared."). There are three additional factors to consider when the issue is whether the impairment substantially limits the individual's life activity of work:

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. 1630.2(j)(3)(ii); *see also Bolton,* 36 F.3d at 943; *Welsh v. City of Tulsa, Okl.,* 977 F.2d at 1419 noting the relevant factors to include "(1) the number and type of jobs from which the impaired individual is disqualified, (2) the geographical area to which the individual has reasonable access, and (3) the individual's job expectations and training." (quoting *Jasany v. United States Postal Service,* 755 F.2d 1244, 1249 (6th Cir. 1985)).

The plaintiff has not come forth with any evidence, much less competent and unambiguous medical evidence, that her high blood pressure substantially limited any one or more of her major life activities. Not surprising, other courts too have found that similar disability claims lacked evidence and, therefore, have held that high blood pressure, by itself, typically is not a disability within the meaning of the Act. *Oswalt v. Sara Lee Corp.,* 889 F.Supp. 253, 257 (N.D.Miss.1995) (citations omitted), *aff'd,* 74 F.3d 91 (5th Cir.1996). The Fifth Circuit said:

According to Oswalt, his physical impairment was his high blood pressure, and this impairment substantially limited a major life activity when his doctor authorized him to miss work while he adjusted to medication.

. . . .

In this case, Oswalt has provided no evidence to show that either the high blood pressure or the alleged side effects from the medication substantially limited his job. We agree with the district court that "[h]igh blood pressure alone, without any evidence that it substantially affects one or more major life activities, is insufficient to bring an employee within the protections of the ADA." *Oswalt,* 889 F.Supp. at 258. We do not imply that high blood pressure in general can never be a "disability," as

defined by the statute. We hold only that Oswalt failed to provide any evidence that *his* high blood pressure substantially limited a major life activity.

74 F.3d at 92. Like *Oswalt,* the plaintiff here wants the finding of disability based on nothing more than a physician's general diagnosis without any evidence that the plaintiff's condition substantially limited her work activity. In addition, the medical leave slips that Deghand submitted say simply that she is excused from work "to run tests" or "due to testing." (Dk. 44, Dep. Ex. 16 and 17). The slips, therefore, are not proof that the hypertension itself was the reason for Deghand's medical leave of absence rather than the temporary condition of testing or adjusting to medication. *See Oswalt v. Sara Lee Corp.,* 889 F.Supp. at 257. The defendant is entitled to summary judgment on this claim.

## ADA CLAIM: DISCHARGE AND MISTREATMENT BECAUSE OF THE PLAINTIFF'S ASSOCIATION WITH A DISABLED PERSON

■ The plaintiff alleges that the defendant mistreated and constructively discharged her because of her association with her husband who is a disabled person. The defendant argues that the plaintiff's allegations do not fall within the express terms or intended purpose of 42 U.S.C. § 12112(b)(4), which provides that the discrimination prohibited under the ADA includes:

excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability with whom the qualified individual is known to have a relationship or association; . . . .

The defendant argues this provision was to protect people who care for disabled persons and who might suffer employment discrimination because of the likelihood of rising health care insurance or increased absenteeism. The defendant also contends that the plaintiff's evidence does not show any causal nexus between the alleged adverse employment actions and her relationship to a disabled person. The plaintiff's burden in proving causation, in the defendant's opinion, is particularly heavy, because she alleges the

defendant treated her worse than her husband who is the disabled employee.

In the final proposed pretrial order, the plaintiff alleges on this claim that upon her husband becoming disabled:

> her supervisors' treatment of her began to change drastically. This change of treatment commencing July 1993, includes exclusion from supervisory meetings and decisions, requiring the plaintiff to follow company policies that other employees were not required to follow, asking plaintiff to demote herself, informing plaintiff that other employees were uncomfortable working with her since her husband was disabled, blaming plaintiff for her husband's disability and verbally harassing the plaintiff about her appearance. Plaintiff's supervisors continually questioned her about her ability to perform her job and to also take care of her husband and informed plaintiff that taking care of a disabled person was affecting her ability to work. The defendant demoted plaintiff on October 7, 1993.

In response to the defendant's motion, the plaintiff contends that she comes within § 12112(b)(4) and that there is no legal prerequisite that the employer treat the disabled employee worse than the related employee. The plaintiff avers that following her husband's mental breakdown she was mistreated in several different respects and eventually constructively discharged.

■■■■ Absent direct evidence, the *McDonnell–Douglas* burdenshifting scheme of proof applies to appropriate claims under the ADA. *Ennis v. National Ass'n of Business & Educational Radio, Inc.,* 53 F.3d 55, 58 (4th Cir.1995); *see White v. York Intern. Corp.,* 45 F.3d at 361. In an ADA discharge case, the plaintiff's prima facie case consists of the following elements:

> (1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a

reasonable inference of unlawful discrimination.

*Ennis,* 53 F.3d at 58. As for an ADA denial of benefits claim, the elements would not change significantly other than to substitute "denied benefits" for "discharge."

■■■■ The defendant cites no authority for reading § 12112(b)(4) more narrowly than its literal terms. Her marriage to a person that has suffered a mental breakdown brings the plaintiff within the protected class. The defendant's remaining argument focuses on whether the circumstances of the adverse employment actions raise a reasonable inference of unlawful discrimination. The fact that the defendant did not mistreat the plaintiff's husband as an employee after he became disabled may be relevant in considering whether the defendant discriminated against the plaintiff by reason of her association. The defendant cites no authority that suggests this fact alone, whatever its weight in irony, would preclude the plaintiff's claim. "[T]he ADA association provision is targeted at prohibiting unfounded stereotypes and assumptions against employees who associate with disabled people." *Den Hartog v. Wasatch Academy,* 909 F.Supp. 1393, 1400 (D.Utah 1995); *see Tyndall v. National Educ. Centers,* 31 F.3d 209, 214 (4th Cir. 1994). The plaintiff avers that all or most of the relevant adverse employment actions occurred soon after her husband's mental breakdown. The plaintiff further avers that supervisors told her that her husband's condition caused too much stress for her and that the employees supervised by the plaintiff were uncomfortable with her partly because of her husband's disability. Based on the record as it now stands, the court finds that these averments sustain a reasonable inference of unlawful discrimination. The defendant's motion for summary judgment on this ADA claim is denied.

## ADA CLAIM: RETALIATION FOR OPPOSITION TO UNLAWFUL TREATMENT OF DISABLED PERSON

In the proposed pretrial order submitted by the magistrate judge,[2] the plaintiff limits her claim to these specific allegations:

---

**2.** The district court has yet to sign and file the

final pretrial order, as the plaintiff was granted

Plaintiff alleges that she was subject to retaliation due to her opposition to the defendant's treatment of her husband. Plaintiff alleges that the retaliation is in violation of the Americans with Disabilities Act. She claims that the retaliation commenced in early July, after her husband had suffered a mental breakdown. The defendant did not call or send flowers, it opposed his worker's compensation claim, and blamed the plaintiff for her husband's condition. Plaintiff informed her supervisors that she was opposed to their treatment of her husband. As a result of this opposition, the plaintiff's supervisors became increasingly hostile toward her and drastically changed in their treatment of her. Plaintiff was eventually discharged as a result of this opposition.

In her response to the summary judgment motion and her accompanying affidavit, the plaintiff now asserts for the first time other incidents of mistreatment and opposition. The plaintiff claims that her husband suffered retaliation and mistreatment when he was transferred to the receiving department after his hernia. The plaintiff says she opposed this treatment by telling Don Bradley the transfer was the cause of her husband's mental breakdown. The plaintiff also claims her husband was mistreated when she was told that if her husband returned it would be to a non-supervisory position. The plaintiff's response does not show how she opposed this last alleged mistreatment of her husband.

■ The defendant objects to the new facts and issues first alleged in the plaintiff's response to the summary judgment motion. The court sustains the defendant's objection, as these allegations have not been properly pleaded and appear to be offered now only in an effort to avoid summary judgment. *See Hanson v. Beloit Newspapers, Inc.*, No. 94–4023–SAC, 1995 WL 646808 at *11 n. 1 (D.Kan. Sept. 15, 1995) (A party may not amend its claims merely by arguing new facts and theories in opposition to the summary judgment motion); *Hullman v. Board of Trustees of Pratt Community College*, 732 F.Supp. 91, 93 (D.Kan.1990) (A party cannot avoid the binding effect of the pretrial order by arguing new issues in its response to summary judgment), *aff'd*, 950 F.2d 665 (10th Cir.1991).

■ The ADA prohibits a person from discriminating against "any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To succeed on a claim of discriminatory retaliation, the plaintiff must prove first a prima facie case: (1) that she engaged in conduct protected by the ADA; (2) that she suffered adverse employment action subsequent to the protected conduct; and (3) that there exists a causal link between the protected activity and the adverse employment action. *Kindle v. Mid–Central/Sysco Food Services, Inc.*, No. 95–2123, 1996 WL 99766, at *9 (D.Kan. Feb. 2, 1996); *Howard v. Navistar Intern. Transport. Corp.*, 904 F.Supp. 922, 931 (E.D.Wis.1995); *Henry v. Guest Services, Inc.*, 902 F.Supp. 245, 251 (D.D.C. 1995). The employee's opposition may be protected activity, even if the employer's challenged conduct ultimately proves to be lawful. *Roth v. Lutheran General Hosp.*, 57 F.3d 1446, 1459 (7th Cir.1995); *see Plakio v. Congregational Home, Inc.*, 902 F.Supp. 1383, 1392 (D.Kan.1995). To be protected, the employee must oppose what she sincerely and reasonably believes is unlawful discrimination. *Id.* " '[I]t is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case.' " *Roth*, 57 F.3d at 1460 (quoting *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir.1982)). "An informal complaint to management qualifies as protected activity." *Plakio*, 902 F.Supp. at 1392–93 (citations

additional time to supplement her claim for intentional infliction of emotional distress and to add a claim for defamation. The plaintiff's proposed contentions concerning these two claims are the subject of the defendant's motion to strike (Dk. 71). As for all other claims, defenses and

issues, the proposed final pretrial order functions for all intents and purposes as a pretrial order. Thus, the court considers it as superseding the pleadings and as controlling the future course of this action absent a pending motion to modify.

omitted); *See Sumner v. United States Postal Service,* 899 F.2d 203, 209 (2nd Cir.1990).

■ Based on what is alleged in the proposed final pretrial order, the plaintiff is unable to show she was engaged in protected conduct. The plaintiff could not reasonably believe she was opposing disability discrimination when she complained about the defendant opposing her husband's workers' compensation claim, not calling or sending him flowers, and blaming her for her husband's condition. The plaintiff offers no factual or legal basis for how she could reasonably believe that an employer violates the ADA when in the exercise of its statutory rights the employer appears in a state workers' compensation proceeding and opposes the disabled employee's application for benefits. Flowers and personal phone calls are simple courtesies which no one would reasonably believe are a matter of federal right. Nor would anyone think that the ADA was violated by an employer's mere speculation over the cause of an employee's disability. Unable to show she was engaged in protected activity, the plaintiff cannot prove a prima facie case of retaliation.

## STATE LAW CLAIM: RETALIATION FOR HER HUSBAND FILING A WORKERS' COMPENSATION CLAIM

■ The plaintiff alleges the defendant retaliated against her because her husband exercised rights under the Kansas Workers' Compensation Act. After her husband filed his second workers' compensation claim for the mental breakdown, the plaintiff alleges her supervisors treated her differently and scrutinized her work. The defendant argues the plaintiff's proof falls far short of clear and convincing for several reasons. The plaintiff alleges retaliation only after her husband's second workers' compensation claim. The defendant did not remove the plaintiff from the cashier supervisor position until it received written confirmation that the plaintiff had disseminated confidential payroll information. The transfer only limited the plaintiff's access to payroll information, and it did not reduce the plaintiff's salary or hours. The court finds that the plaintiff has come forth with sufficient evidence from

which a reasonable jury could find retaliation.

■ Kansas employment law is grounded on the doctrine of employment-at-will, that is, absent an express or implied contract "between an employee and his employer covering the duration of employment, the employment is terminable at the will of either party, and the employee states no cause of action for breach of contract by alleging that he has been discharged." *Morriss v. Coleman Co.,* 241 Kan. 501, 510, 738 P.2d 841 (1987) (citing *Johnson v. National Beef Packing Co.,* 220 Kan. 52, 551 P.2d 779 (1976)). This means an employer may discharge an employee-at-will "for good cause, for no cause, or even for wrong cause" without subjecting itself to legal liability. *Id.* at 508, 738 P.2d 841. The only exceptions to this rule are based on public policy. *Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 176, 872 P.2d 252 (1994). Relevant here is the exception that an employer may not discharge an employee in retaliation for filing a workers' compensation claim, *Murphy v. City of Topeka–Shawnee County Dept. of Labor Svcs.,* 6 Kan.App.2d 488, Syl. ¶ 7, 630 P.2d 186 (1981) or for being absent or not calling in an anticipated absence because of a work-related injury, *Coleman v. Safeway Stores, Inc.,* 242 Kan. 804, Syl. ¶ 3, 752 P.2d 645 (1988), or for intending to file a worker's compensation claim, *Chrisman v. Philips Industries, Inc.,* 242 Kan. 772, 775, 751 P.2d 140 (1988). Particularly relevant here is the Kansas Court of Appeals' decision in *Marinhagen v. Boster, Inc.,* 17 Kan.App.2d 532, Syl. ¶ 5, 840 P.2d 534 (1992), *rev. denied,* 252 Kan. 1092 (1993), which extended this tort to cover spouses who are co-employees:

When a married couple both work for the same employer, and one exercises his or her rights under the Workers Compensation Act following an on-the-job injury, the employer may not retaliate against the non-injured spouse by terminating him or her from employment any more than the employer can retaliate against the injured spouse. To allow such would frustrate the purpose of our opinion in *Murphy v. City of Topeka*[–Shawnee County Dept. of Labor Svcs.], 6 Kan.App.2d 488, 630 P.2d 186

(1981), to protect employees by allowing them to freely exercise their rights under the Act.

*See also Ortega v. IBP, Inc.,* 255 Kan. 513, 518, 874 P.2d 1188 (1994).

■ An employer rarely admits to a retaliatory intent; therefore, the employee must look to circumstantial evidence in proving the claim. *Marinhagen v. Boster, Inc.,* 17 Kan.App.2d at 540, 840 P.2d 534. Because reasonable persons may differ on the inferences critical in determining a person's state of mind, summary judgment is more often the inappropriate way of resolving the issue of an employer's retaliatory intent. *See Koopman v. Water Dist. No. 1 of Johnson County,* 972 F.2d 1160, 1164 (10th Cir.1992). Nevertheless, when the employee fails to come forth with sufficient evidence to raise a genuine issue regarding the employer's intent or an essential element of her retaliatory discharge claim, the district court may properly grant an employer's motion for summary judgment. *See Koopman,* 972 F.2d at 1164.

■ The burden rests with the employee to prove that the employer terminated him or her in retaliation for filing a claim under the Workers' Compensation Act. *See Ortega,* 255 Kan. at 528, 874 P.2d 1188. The employee can recover only upon proving that the discharge was "based on," "because" of, "motivated by" or "due to" the employer's intent to retaliate. *Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 146–148, 815 P.2d 72 (1991). The employee need not prove that retaliation was the employer's sole motive or reason for the termination. *Brown,* 249 Kan. at 147, 815 P.2d 72. The employee must prove her claim "by a preponderance of evidence, but the evidence must be clear and convincing in nature."[3] *Ortega,* 255 Kan. at 528.

■ The federal district courts in Kansas have adapted the burden-shifting approach applied in discrimination cases for use in analyzing state-law retaliatory discharge claims. *Ramirez v. IBP, Inc.,* 913 F.Supp. 1421, 1429 (D.Kan.1995); *Huffman v. Ace Elec. Co., Inc.,* 883 F.Supp. 1469, 1475 (D.Kan.1995); *Lawrence v. IBP, Inc.,* No. 94–2027–EEO, 1995 WL 261144, at *13 n. 2, 1995 U.S. Dist. LEXIS 6118, at *29 n. 2 (D.Kan. Apr. 21, 1995); *see, e.g., Rosas v. IBP, Inc.,* 869 F.Supp. 912, 916 (D.Kan.1994); *cf. Ortega,* 255 Kan. at 526, 874 P.2d 1188 (After noting that the plaintiff must prove a causal nexus between the employee's protected activity and the employer's decision to terminate, the Kansas Supreme Court referred to the burden-shifting scheme from *McDonnell–Douglas* as the approach it utilizes in discrimination and free speech employment cases). To establish a typical prima facie case of retaliatory discharge here, the plaintiff must show (1) that her husband worked for the defendant employer and either exercised statutory rights under the Workers' Compensation Act or sustained a work-related injury for which he could assert a future claim for such benefits; (2) that the employer had knowledge of either her husband's exercise of statutory rights under the Workers' Compensation Act or the fact that her husband had sustained a work-related injury for which he could file a future claim for benefits; (3) that the employer terminated her employment; and (4) that a causal connection existed between the protected activity or injury, and the termination. *See Huffman,* 883 F.Supp. at 1475; *Rosas,* 869 F.Supp. at 916; *Chaparro v. IBP, Inc.,* 873 F.Supp. 1465, 1472 (D.Kan.1995). Proof of a prima facie case raises " 'a rebuttable presumption' " of a retaliatory intent. *See Ingels v. Thiokol Corp.,* 42 F.3d 616, 621 (10th

---

**3.** "Clear and convincing" refers to the quality of proof, not the quantum. *Newell v. Krause,* 239 Kan. 550, 557, 722 P.2d 530 (1986). For the evidence to be clear and convincing, the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.

*Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 78, 596 P.2d 816 (1979) (citations omitted). The evidence is clear "if it is certain, unambiguous, and plain to the understanding. It is convincing if it is reasonable and persuasive enough to cause the trier of facts to believe it." *Ortega,* 255 Kan. at 528, 874 P.2d 1188 (*citing Chandler v. Central Oil Corp.,* 253 Kan. 50, 58, 853 P.2d 649 (1993)).

Cir.1994) (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 771 (10th Cir.1988)); *Rosas*, 869 F.Supp. at 916.

 Once the plaintiff employee establishes a prima facie case, it becomes the employer's burden to produce a legitimate, nondiscriminatory reason for the discharge. *Huffman*, 883 F.Supp. at 1475. While its reason must be specific and clear, the employer need not litigate the merits of its reason, prove its reason was bona fide, or prove its reason was applied in a nondiscriminatory fashion. *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir.1992) (citations omitted). Once the employer produces such a reason, the presumption of retaliatory intent raised by the prima facie case "'simply drops out of the picture.'" *Ingels*, 42 F.3d at 621 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)). The burden of persuasion now falls back to the employee to prove with clear and convincing evidence that the employer acted with a retaliatory intent. *Rosas*, 869 F.Supp. at 916.

 To avoid summary judgment at this point in the analysis, the employee must assert specific facts establishing a triable issue as to whether the employer's reason for discharge is a mere cover-up or pretext for retaliatory discharge. *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994). "If no facts relating to the pretextuality of the defendant's action remain in dispute, summary judgment is appropriate." *Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 798 (10th Cir.1993), *overruled in part on other grounds, Buchanan v. Sherrill*, 51 F.3d 227, 229 (10th Cir.1995). On the other hand, should the plaintiff come forth with a prima facie case and evidence that the defendant's reasons are pretextual, the case must go to the jury. *Jones v. Unisys Corp.*, 54 F.3d 624, 630 (10th Cir. 1995).

Construing the facts in the light most favorable to the plaintiff, the defendant's treatment of the plaintiff changed for the worse shortly after her husband filed his second workers' compensation claim. The defendant began limiting her supervisory authority over subordinates, excluded her from team leader meetings, directed her to train her subordinates on her job duties, and kept her uninformed about company changes and policy and procedure matters. The assistant manager, Dawn Miller, admitted to the plaintiff that she was uncomfortable working with the plaintiff after her husband's mental breakdown and his workers' compensation claim. Miller also revealed to the plaintiff that Don Bradley had instructed management personnel not to speak with the plaintiff. These actions by the defendant's management and other conduct observed and averred by the plaintiff establish a prima facie case of retaliation with clear and convincing evidence.

The plaintiff also comes forth with clear and convincing evidence establishing a triable issue as to whether the defendant's reason for removing her and then constructively discharging her is a mere cover-up or pretext for retaliation. First, the defendant's business reason does not explain the general adverse treatment which the plaintiff alleges she received from management after her husband filed his second workers' compensation claim. Second, the defendant accepted the allegations made in Falkenstein's letter without investigating them and acted on the allegations without questioning or confronting the plaintiff with them. Third, the plaintiff avers that as a supervisor she had been instructed to document all activities by employees who had filed workers' compensation claims to check if they were really injured and to find cause for terminating them. Fourth, the plaintiff avers that she was followed and her work scrutinized after her husband's workers' compensation claim. Fifth, over a week before Falkenstein submitted her letter, Bradley encouraged the plaintiff to take a non-supervisory position due to the situation with her husband. The court denies the defendant's motion for summary judgment on this retaliation claim, as the defendant has not shown that there is an absence of evidence to support it.

## STATE LAW CLAIM: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

 The plaintiff alleges the defendant intentionally inflicted emotional distress by asking her to request a demotion and when

she refused by increasing its harassment and adverse treatment of her.[4] The plaintiff further alleges that the defendant conspired with an hourly employee to record false statements about the plaintiff in order to create cause for removing her from the supervisor position. The defendant seeks summary judgment arguing that the alleged conduct does not reach the level of extreme and outrageous.

Kansas recognizes the tort of intentional infliction of emotional distress or outrage. *Moore v. State Bank of Burden,* 240 Kan. 382, 388, 729 P.2d 1205 (1986), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987). Liability under this tort arises when a person engages in extreme and outrageous conduct and thereby intentionally or recklessly causes severe emotional distress to the plaintiff. *Id.* To prevail on this claim, the plaintiff must prove:

(1) The conduct of the defendant must be intentional; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress must be extreme and severe.

*Id.* (citing *Hoard v. Shawnee Mission Medical Center,* 233 Kan. 267, Syl. ¶ 3, 662 P.2d 1214 (1983)). Conduct is not extreme and outrageous unless regarded as exceeding the bounds of decency or as utterly intolerable in a civilized society. *Wiehe v. Kukal,* 225 Kan. 478, 482, 592 P.2d 860 (1979). Liability also depends on clearing two threshold determinations by the court that "the defendant's conduct may reasonably be regarded as so

extreme and outrageous as to permit recovery; and ... [that] the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." *Roberts v. Saylor,* 230 Kan. 289, 292–93, 637 P.2d 1175 (1981).

The alleged actions here taken by the defendant are more akin to the kind of "ordinary business decisions ... made every day ... across the nation" as opposed to what a civilized society would call atrocious, indecent and utterly intolerable. *Anspach v. Tomkins Industries, Inc.,* 817 F.Supp. 1499, 1508 (D.Kan.1993), *aff'd,* 51 F.3d 285 (10th Cir. 1995) (Table). Asking an employee to volunteer for a demotion is an example of the kind of business actions ordinarily expected from employers. As for the alleged harassment, the plaintiff's own conclusory opinion that the defendant's conduct is extreme and outrageous is not enough to create a genuine issue of fact. The plaintiff must come forth with specific facts showing that the conduct occurred with such frequency and was of such a nature as to reach the threshold of extreme and outrageous.

" '[L]iability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities.' " *West v. Boeing Co.,* 843 F.Supp. 670, 677 (D.Kan.1994) (quoting *Roberts,* 230 Kan. at 293, 637 P.2d 1175), *vacated in part on other grounds,* 851 F.Supp. 395 (D.Kan.1994). Both as a member of the public and as an employee, the plaintiff is necessarily expect-

---

**4.** In the proposed final pretrial order submitted by the magistrate judge, the plaintiff generally alleged the following adverse treatment:

"exclusion from supervisory meetings and decisions, requiring the plaintiff to follow company policies that other employees were not required to follow, asking plaintiff to demote herself, informing plaintiff that other employees were uncomfortable working with her since her husband was disabled, blaming plaintiff for her husband's disability and verbally harassing the plaintiff about her appearance. Plaintiff's supervisors continually questioned her about her ability to perform her job and to also take care of her husband and informed plaintiff that taking care of a disabled person was affecting her ability to work."

On October 13, 1995, the district court subsequently allowed the plaintiff to add "the defendant's solicitation of Falkenstein's letter as one of several instances of conduct alleged in count five, which if considered as a whole, may amount to extreme and outrageous conduct." (Dk. 67 at 10). On October 30, 1995, the plaintiff filed her proposed amended pretrial order. To her intentional infliction of emotional distress claim, she adds more than just this additional instance of conduct. The district court shall not consider those allegations that exceed the scope of its prior order and the proposed final pretrial order submitted by the magistrate judge.

ed to be inured to some " 'amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind.' " *Id.* The employer's actions do not become actionable in tort simply because they are driven by a retaliatory motive. *See Anspach v. Tomkins Industries, Inc.,* 817 F.Supp. at 1507; *Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260, 1262 (D.Kan.1984). "There must be something more, something about the manner in which the retaliation occurred, that makes the conduct actionable...." *Anspach,* 817 F.Supp. at 1508. Adding the defendant's solicitation of Falkenstein's letter to the balance of the defendant's other actions still does not create an actionable tort of outrage. The defendant is entitled to summary judgment on this claim.

## STATE LAW CLAIM: BREACH OF ORAL EMPLOYMENT CONTRACT

The plaintiff alleges that after her husband's mental breakdown she had to obtain day care services for their child. According to the plaintiff, the defendant orally offered and she accepted a work schedule compatible with the day care services she had arranged. The plaintiff alleges she detrimentally relied on the defendant's offer by securing day care services. In the proposed final pretrial order, the plaintiff further alleges:

Defendant constructively discharged her from her supervisory position by demoting her and offering her an inferior seasonal position. The inferior position offered by the defendant would have required the plaintiff to work different hours and possibly travel to different parts of the state. The removal of plaintiff from her position affected the plaintiff's ability to perform according to the terms of her contract with the day care provider. Plaintiff asserts that on October 7, 1993, defendant breached its contract of employment by offering plaintiff a position which required the plaintiff to work varied hours and to possi-

bly travel outside the Topeka, Kansas, area.

The defendant contends that the plaintiff was a terminable at-will employee and that the terms of her employment were not governed by any express or implied contract. The defendant further points out that at the time of the plaintiff's hiring she was informed that her completion of the ninety-day, new-hire period did not "guarantee" her any specific length or type of employment. She also was informed at the same time that "associates' working hours must remain flexible." The plaintiff concedes she was an employee-at-will but argues the defendant orally "guaranteed" her regular work hours to accommodate her day care arrangements.

The plaintiff's evidence does not establish a binding oral agreement with sufficiently definite terms from which one could determine what duties and rights were involved and whether performance was complete. *See Lessley v. Hardage,* 240 Kan. 72, 79, 727 P.2d 440 (1986). The plaintiff testified that Bradley and Miller told her they "would be very flexible with" her. (Plaintiff's Dep. at 341). In her affidavit, the plaintiff avers:

Consequently, I could only work hours during which our son's day care was open for business. As Don Bradley and Dawn Miller stated that they would accommodate me in any way necessary for me to care for my husband and son, I established working hours conducive to day care with their knowledge and permission. Thus upon my demotion I was allegedly offered a job which I knew and which management (sic) to have hours I could not work due to my husband's disability and son's day care requirements.

(Dk. 47, Ex. A at 5). A reasonable jury could not find from this evidence that the parties had agreed the plaintiff would work indefinitely a specific schedule or a specific assignment and that the defendant breached any such contract simply by offering the plaintiff a position in marketing.[5] The defendant is entitled to summary judgment on this claim.

5. The plaintiff's contract claim is a thinly disguised effort to circumvent the employment-at-will doctrine. She does not seek to enforce her rights under the alleged oral contract but to

recover economic losses and future economic losses caused by the loss of employment. Her rights under the alleged oral contract ended when she either quit or was terminated. Quite

## STATE LAW CLAIM: DEFAMATION

In March of 1995, the plaintiff filed her second motion to amend complaint (DK. 32) seeking to add, *inter alia,* a defamation claim. The plaintiff's proposed defamation claim alleged that Falkenstein's letter dated September 29, 1993, contained false and defamatory statements concerning her and was provided "to the management of 'Sam's Club' of Topeka, a third party who understood the communication." (Dk. 32). The district court granted the plaintiff leave to add her defamation claim and gave the parties time "to submit their respective contention and theories sections adding the defamation claim and any defenses." (Dk. 67). The plaintiff has submitted proposed contentions that include two additional publications of the alleged defamatory letter. The court disregards those new allegations as they were not the subject of a motion to amend and they exceed the scope of the district court's order (Dk. 67). The plaintiff's counsel do not have cause for summarily adding these allegations without first filing a motion to amend or seeking leave from the court.

■ The defendant seeks summary judgment on this claim on the strength of two contentions. First, the plaintiff is not able to prove that the letter damaged her reputation, because the letter simply confirmed the suspicions of Bradley and Miller. The deposition testimony of Bradley and Miller on this point, however, does not show the absence of a genuine issue of material fact. Their testimony on what they had heard from other sources or had observed does not coincide closely with all the alleged false statements in the letter. More importantly, if Bradley already held a low opinion of Deghand's abilities and reliability, then why did he wait to take any action to remove the plaintiff from supervision until after he received the letter. These are matters for the jury to decide.

■ The defendant's second contention is that the plaintiff's defamation claim is barred by the one-year statute of limitations. It is uncontroverted that the alleged defamatory letter was published on September 29, 1993.

The plaintiff filed her original complaint on September 20, 1994, and her motion to amend her complaint to add a defamation claim on March 28, 1995. The plaintiff relies on the "relation back" provisions of Rule 15(c) of the Federal Rules of Civil Procedure to avoid summary judgment on limitations grounds.

■ Rule 15(c)(2) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." The premise underlying Rule 15(c) is "that once notified of pending litigation over particular conduct or a certain transaction or occurrence, the defendant has been given all the notice required for purposes of the statute of limitations." *Marsh v. Coleman Co., Inc.,* 774 F.Supp. 608, 612 (D.Kan.1991) (citing *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 149 n. 3, 104 S.Ct. 1723, 1725 n. 3, 80 L.Ed.2d 196 (1984)). "The linchpin to Rule 15(c) is notice before the limitations period expires." *Id.* (citing *Schiavone v. Fortune,* 477 U.S. 21, 31, 106 S.Ct. 2379, 2385, 91 L.Ed.2d 18 (1986)). Put another way, the " '[d]efendant is not deprived of the protection of the statute of limitations if the original complaint fairly discloses the general fact situation out of which the new claims arise.' " *Spillman v. Carter,* 918 F.Supp. 336, 340 (D.Kan.1996) (quoting *Masters v. Daniel Intern. Corp.,* 1991 WL 107410, at *10 (D.Kan. May 3, 1991)).

■ As a general rule, amendments will relate back if they amplify the facts previously alleged, correct a technical defect in the prior complaint, assert a new legal theory of relief, or add another claim arising out of the same facts. *See F.D.I.C. v. Conner,* 20 F.3d 1376, 1385–86 (5th Cir.1994); *Marsh,* 774 F.Supp. at 612. On the other hand, amendments generally will not relate back if they interject entirely different facts, conduct, transactions or occurrences. *Id.*

---

simply, there is no evidence that the defendant breached the alleged oral contract as the plaintiff

never worked and was never asked to work under a schedule other than her regular one.

The court finds that the plaintiff's defamation claim based on the publication of Falkenstein's letter to Bradley and Miller arises out of the same conduct, transaction, and occurrence alleged in the plaintiff's original complaint. The original complaint put the defendant on notice that its reasons and bases for removing or demoting the plaintiff from a supervisory position would be an issue. Specifically, the defendant knew that the plaintiff would be challenging the validity and truthfulness of any business reasons the defendant would have for demoting her. Since the defendant apparently knew as of the original complaint that it demoted the plaintiff based on what was stated in the Falkenstein letter, a reasonably prudent person in the defendant's position would have expected that the truthfulness of the letter, the manner in which the defendant learned of or acquired the letter and the defendant's reliance on the letter, all would be matters at issue in the discrimination and retaliation claims. The court concludes that the plaintiff's defamation claim relates back to the filing of her original complaint. Thus, her claim is not barred by the one-year statute of limitations.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk. 43) is granted as to the plaintiff's ADA claim for discrimination on the basis of her disability, ADA claim for retaliation, state law claim for intentional infliction of emotional distress, and state law claim for breach of oral contract of employment; and is denied as to the plaintiff's ADA claim for mistreatment and constructive discharge due to association with a disabled person and the state law claim of retaliation on the basis of her husband's workers' compensation claim;

IT IS FURTHER ORDERED that the defendant's motion to strike (Dk. 49) the affidavits of the plaintiff and her husband are granted in part and denied in part;

IT IS FURTHER ORDERED that the defendant's motion for summary judgment on the defamation claim (Dk. 69) is denied;

IT IS FURTHER ORDERED that the defendant's motion to strike or disallow the plaintiff's proposed additions to the pretrial order (Dk. 71) is granted, and the court disallows those proposed additions that exceed the scope of this court's prior order.